IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WATERTON POLYMER PRODUCTS USA, INC. (formerly known as WATERTON POLYMER PRODUCTS USA, LLC), and WATERTON POLYMER PRODUCTS, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> EDIZONE, LLC, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER ON CLAIM CONSTRUCTION <br><br><br> Case No. 2:12-CV-17 TS <br><br> District Judge Ted Stewart |

This matter is before the Court for claim construction. The parties request construction of the following terms: longitudinal axis, length, buckling, elastomeric material, comprising, and copolymer. The Court held a *Markman* hearing on December 16, 2013. Having considered the arguments of the parties and the materials provided, the Court construes the terms as follows.

I. BACKGROUND

Plaintiffs Waterton Polymer Products USA, Inc. (formerly known as Waterton Polymer Products USA, LLC), and Waterton Polymer Products, Ltd. (collectively "Plaintiffs") brought this action against Defendant EdiZONE, LLC ("Defendant") seeking a declaratory judgment of patent non-infringement. Defendant filed a counterclaim seeking a determination of infringement. The parties have now submitted briefs seeking construction of the above-listed claims.

## II. STANDARD OF REVIEW

The Supreme Court, in *Markman v. Westview Instruments, Inc.*,[1] held that claim construction is a matter exclusively within the province of the court.[2] Claim terms are generally given their ordinary and accustomed meaning as understood by one of ordinary skill in the art.[3]

> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful.[4]

A patentee may choose, however, "to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."[5] "Thus, second, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning."[6] "Third, the court may also consider the prosecution history of the patent, if in evidence."[7]

## III. DISCUSSION

A. LONGITUDINAL AXIS AND LENGTH

The parties first seek construction of the terms "longitudinal axis" and "length" as used in Defendant's Patent Nos. 5,749,111 (the "'111 Patent") and 6,026,527 (the "'527 Patent").

---

[1] 517 U.S. 370 (1996).

[2] *Id.* at 372.

[3] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

[4] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

[5] *Vitronics Corp.*, 90 F.3d at 1582.

[6] *Id.*

[7] *Id.*

Plaintiffs propose a definition of "longitudinal axis" as an axis corresponding to the greatest dimension of the column and "length" as the greatest dimension of the column. Defendant proposes a definition of "longitudinal axis" as the axis that extends along the length of the column from the column top to the column bottom or from one end of the column to the other end of the column, and not across the column from a column wall to the opposite column wall even if that measurement across the column is greater than the measurement of the length of the column from the top (one end) to the bottom (other end) and "length" as the vertical dimension or height, and not the width, of a column when it is in the position it is typically used to support a load.

The term "axis" is defined as an imaginary straight line in the center of an object.[8] "Longitudinal" is defined as running lengthwise.[9] Thus, the definition of "longitudinal axis" is a straight line running lengthwise through the center of an object. As set forth above, both parties seek to add language to the definition of "longitudinal axis" to correspond with their respective definitions of "length." Thus, to properly construe "longitudinal axis," the Court must determine how to construe "length."

Plaintiffs rely on a dictionary definition to define "length" as the greatest dimension of the column. Plaintiffs argue that length should simply be given its common sense meaning. However, the term "length" is not so easily defined. For example, length can be "the extent of a garment in a vertical direction when worn."[10] In such situations, the length of an article of clothing may not, in fact, be the greatest dimension of that object. Rather, the length is tied to

---

[8] New Oxford American Dictionary 114 (3d ed. 2010) ("An imaginary straight line passing through the center of a symmetrical solid . . . .").

[9] *Id.* at 1030.

[10] *Id*. at 999.

the orientation of the object. Further, the Court must consider the term "length" as it is used here, which concerns the length of a column. Defendant correctly points out that the customary meaning of the term length when referring to a column is its vertical measurement, not its width. As the general use of the term "length" does not conclusively resolve this question, it is helpful to turn to the patent specifications.

The specifications provide that the columns have a longitudinal axis "which is preferred to be oriented in the invented cushion parallel to the direction of the longitudinal axis of a column which should be the direction that the cushioned object sinks into the cushion."[11] As a result, the column top is at the side of the cushion that contacts the cushioned object and the column bottom faces the ground.[12] When a cushioned object is placed on top of the cushioning material, the column walls buckle outward allowing "the column . . . to decrease in length along its longitudinal axis."[13]

This language supports a conclusion that the length of the longitudinal axis corresponds to a vertical measurement, or height, rather than width. For example, when the pressure is applied from the top of a vertical column, the column will buckle outwardly resulting in a shortened length along the longitudinal axis. If length corresponded to a horizontal axis because it was the longest dimension, the length of the axis would not diminish when pressure is applied from the top. As will be discussed, the claim language specifically directs that the cushioned object contact the top of the cushioning element. In the case of a horizontal axis, pressure would need to be applied from the sides, not the top, to allow the longitudinal axis to decrease in length. Thus, the specifications support Defendant's proposed construction.

---

[11] '111 Patent col. 11, l. 3–6; '527 Patent col. 13, l. 55–58.

[12] '111 Patent col. 11, l. 7–9; '527 Patent col. 13, l. 59–61.

[13] '111 Patent col. 11, l. 32–33; '527 Patent col. 14, l. 17–18.

The language of the claims also compels the conclusion that the length of the longitudinal axis corresponds to its vertical dimension. The '111 Patent and '527 Patent generally cover gel cushioning media. The media has a top, bottom, and outer periphery. The cushioning media will deform under the compressive force of a cushioned object. The cushioning media is itself made up of "columns having a longitudinal axis along its length."[14] The columns have a wall that defines a column interior and each column has a top and a bottom.

The cushioning elements are designed "to have a cushioned object placed in contact with said cushioning element top."[15] Where the cushioned object meets the cushioned element is important in determining the definitions of "longitudinal axis" and "length" because the patents state that the "column's longitudinal axis is located generally parallel to the direction of a compressive force exerted on the cushioning element by a cushioned object in contact with said column top."[16]

Under this language, the cushioned object will be placed upon the top of the cushioning media. The column axes are generally parallel to the compressive force exerted on the cushioning element by the cushioned object. Thus, it only makes sense that the longitudinal axis

---

[14] '111 Patent col. 32, l. 48–49; '527 Patent col. 74, l. 16–17; '527 Patent col. 76, l. 64–65.

[15] '111 Patent, col. 32, l. 52–54; *see also* '527 Patent col. 74, l. 20–21 ("wherein the cushioning element is adapted to have a cushioned object placed in contact with said top"); '527 Patent col. 77, l. 1–3 ("wherein the cushioning element is adapted to have a cushioned object placed directly or indirectly in contact with said top").

[16] '111 Patent, col. 32, l. 58–61; '527 Patent, col. 74, l. 24–29 ("at least one of said columns is positioned within said cushioning element such that said column axis is positioned generally parallel to the direction of a compressive force exerted on the cushioning element by a cushioned object in contact with said cushioning medium"); '527 Patent col. 77, l. 6–11 ("a plurality of said columns are positioned within said cushioning medium such that said column axes are positioned generally parallel to the direction of a compressive force exerted on the cushioning element by a cushioned object in contact with said cushioning medium").

of the columns goes from the top of the column to the bottom of the column, because that would be parallel to the force being applied from the top.

Plaintiffs argue that Defendant's definition is not supported by the prosecution history and that Defendant specifically disclaimed any such definition when it attempted to distinguish the '527 Patent from the Bickett Patent. The Bickett Patent relates to rubber pads for use primarily as sleeping pads or mattresses. During reexamination of the '527 Patent, Defendant stated that the structure of the Bickett Patent "would not meet the elements and limitations of an amended claim 1."[17]

Defendant stated that "[t]he columns of Bickett extend longitudinally in a horizontal direction through the Bickett pad from one side thereof toward another, opposite side thereof. The columns of Bickett do not extend longitudinally between the top and bottom surfaces of the Bickett pad."[18] Plaintiffs interpret this to mean that Defendant "admitted the underlying premise that the term 'longitudinal axis'—as set forth in the claim language—is the axis for the longer dimension of whatever hollow object or column is at issue."[19] By doing so, Plaintiffs argue that Defendant "cannot now argue for a contrary claim that the claimed 'longitudinal axis' could be an axis for one of the shorter dimensions of a hollow object or column."[20] Plaintiff goes on to state that "[h]ad this contrary position been articulated by the patentee during prosecution, then Bickett would have been invalidating prior art and EdiZONE's patents could not have issued."[21]

---

[17] Docket No. 32, Ex. I at 18.

[18] *Id.*

[19] Docket No. 33, at 7 (emphasis omitted).

[20] *Id.* (emphasis omitted).

[21] *Id.* at 8.

Plaintiffs read too much into the statements Defendant made concerning the Bickett patent during reexamination. At no point did Defendant limit the definition of longitudinal axis to the longest dimension. Rather, Defendant distinguished the columns in the Bickett Patent from its own columns because those columns ran horizontally instead of vertically.

Further, Plaintiffs assert that Defendant's patents would not have issued because Bickett would have been invalidating prior art. However, the difference in the orientation of the columns was only one of the reasons Defendant put forward in distinguishing the '527 Patent from the Bickett Patent. Defendant also argued that "while a lateral axis of the Bickett columns may be defined that extends between the top and the bottom of the Bickett pad, this lateral axis is not straight since the columns of Bickett are specifically shaped so that each has a tendency to bend or buckle under a compressive load."[22] Defendant pointed to language from the Bickett patent explaining that the upper half of the Bickett column is slightly inclined from the vertical, while the lower half of each Bickett column is similarly inclined in the opposite direction. Defendant explained that "the axis of the columns of Bickett that extends between the top and the bottom of the Bickett pad are bent at the middle of the Bickett columns, and do not have 'a straight longitudinal axis extending along its length from [the] top to [the] bottom of [the Bickett pad] in an undeformed condition,' as recited in amended independent claim 1."[23] Based upon this, it is not necessarily true that Defendant's patent would not have issued but for its earlier distinction.

In light of the foregoing, the Court will adopt Defendant's definitions of "longitudinal axis" and "length" with slight modifications. The Court construes "longitudinal axis" as the straight line running along the length of the column vertically from the column top to the column

---

[22] Docket No. 32, Ex. I at 18.

[23] *Id*.

bottom or from one end of the column to the other end of the column. "Length" is construed as the vertical dimension or height of a column when it is in the position it is typically used to support a load. These definitions are consistent with the ordinary use of these terms, as well as the specifications, claim language, and prosecution history.

B.   BUCKLING

The parties also seek construction of the term "buckling" as used in the '111 Patent and the '527 Patent. The Court previously construed this term in *Edizone, LC v. Cloud Nine, LLC*.[24] In that case, the Court construed "buckling" as "the planned failure or collapse of a column wall resulting in redistribution or lessening of the load carried by the column."[25]

Plaintiffs seek to refine this construction such that "buckling" is a significant distortion in the length of the column wall resulting in redistribution or lessening of the load carried by the column.[26] Defendant also seeks a slight modification of the Court's previous construction. Defendant seeks to construe "buckling" as the planned failure or collapse of a column wall resulting in redistribution or lessening of the load carried by the column when the pressure is applied to the top of the column wall.

Plaintiffs argue that their construction is supported by the patent specification. Plaintiffs point to language in the specification that states: "the column walls buckle radially outward orthogonally from the longitudinal axis of the column. This permits the column 1101 to decrease in total length along its longitudinal axis and thereby conform to the . . . cushioned object."[27] Nothing in this language, however, requires a "significant distortion." Rather, as Defendant

---

[24] No. 1:04-CV-117 TS, Docket No. 365 (D. Utah Sept. 21, 2006).

[25] *Id.* at 6.

[26] Docket No. 33, at 9–10.

[27] '111 Patent col. 11, l. 30–34.

8

correctly argues, buckling can occur in varying degrees. Figure 3 of the '111 Patent provides an excellent example where some columns have buckled to a significant degree, while others have buckled to a much lesser degree.

Plaintiffs further argue that buckling should be distinguished from collapsing. Plaintiffs rely on language from the '111 Patent specification, which states that

> [i]f a cushioned object travels a substantial distance sideways in the cushion, the hollow portion of the columns may be eliminated by opposing column walls collapsing to meet each other rather than either substantially compressing the cushioning media or by buckling as depicted in FIGS. 13 and 14. This would not provide the desired cushioning effect as it would result in collapsed columns within the cushion (rather than buckled columns).[28]

This language does not support Plaintiffs' proposed construction. This language discusses an instance where pressure is being applied to the columns from the side, as opposed to pressure being applied from the top of the column. In an instance where pressure is applied from the side, the columns may collapse, rather than buckle. This is not the same as when pressure is applied from the top. As Defendant notes, "[c]olumns are not designed to support side pressure and simply compress into a pile of gel."[29]

Plaintiffs also cite to *Jakks Pacific, Inc. v. Imperial Toy Corp.*,[30] to support their proposed construction. The court in *Jakks* construed "buckling" "to require a significant distortion of the length of the column wall when pressure is applied to the top of the column. That is, an almost imperceptible yielding to pressure from the top of the column wall would not constitute buckling."[31]

---

[28] *Id.* col. 10, l. 43–52.

[29] Docket No. 37, at 10.

[30] No. CV 05-3228 SVW (C.D. Cal. Jan. 26, 2006).

[31] Docket No. 32 Ex. F, at 24.

9

This language is not inconsistent with the Court's earlier construction. While the court in *Jakks* stated that buckling required a "significant distortion," it was quick to explain that this required something more than "an almost imperceptible yielding." The *Jakks* court seemed to recognize that buckling can occur in varying degrees. This Court's prior construction is consistent with this limitation.

Based on the above, the Court will construe "buckling" as the planned failure or collapse of a column wall resulting in redistribution or lessening of the load carried by the column when the pressure is applied to the top of the column wall.

C. ELASTOMERIC MATERIAL, COMPRISING, AND COPOLYMER

The parties seek construction of three terms in Defendant's Patent No. 6,797,765 (the "'765 Patent"). The basic dispute is whether the '765 Patent discloses a product claim or whether it discloses a process or product-by-process claim. The definitions proposed by the parties reflect this disagreement.

Plaintiffs suggest that "elastomeric material" should be defined as an elastomeric composition of matter (i.e., not an elastomeric product produced by a process). Plaintiffs define "comprising" as containing the matter listed thereafter (i.e., the enumerated plasticizer, copolymer, and gel) and, potentially, other matter. Finally, Plaintiffs would define "copolymer" as the copolymer contained in the elastomeric material (i.e., not the copolymer ingredient to the elastomeric material).

Defendant argues that "elastomeric material" should be defined as matter that yields elastically to pressure. Defendant defines "comprising" as including the limitations that follow without excluding other elements. Defendant defines "copolymer" as the limiting copolymer ingredient enumerated in the claim before and after it is mixed with the limiting plasticizer.

Turning first to "elastomeric material," Plaintiff argues that this is a product, not a process and not a product produced by a process. However, the Court finds that the '765 Patent discloses more than merely a product, it discloses either a process or a product created by a process.

Claim 1 of the '765 Patent describes a process for creating the resultant elastomeric material. The elastomeric material comprises a plasticizer and a SEEPS triblock copolymer. The elastomeric material is created when "the plasticizer and copolymer are mixed to form a gel."[32] As will be discussed in more detail below, the claim terms require that the "triblock copolymer has a measurable percent elongation at break" and that the "plasticizer tends to increase the present elongation at break of said SEEPS triblock copolymer."[33] Further, the "triblock copolymer has a rigidity measurable on the Gram Bloom scale" and the "plasticizer tends to decrease the Gram Bloom rigidity of said SEEPS triblock copolymer."[34] All of this language indicates that the patent covers something more than the final product as asserted by Plaintiffs.

Further, Plaintiffs' proposed definition adds language which is not contained in the patent claims or specification. Plaintiffs define "elastomeric material" as "an elastomeric composition of matter." The word "composition" is not contained in the claim and is not supported by the language of the patent.

Defendant defines "elastomeric material" as matter that yields elastically to pressure. This definition is consistent with the plain and ordinary meaning of the words and the claim language. Therefore, the Court will adopt this definition.

---

[32] '765 Patent col. 7, l. 56–57.

[33] *Id.* col. 8, l. 3–6.

[34] *Id.* col. 8, l. 7–10.

The Court next considers the term "comprising." "'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."[35] Plaintiffs' proposed definition is similar, but contains limiting language that is not supported by the claim language. Plaintiffs argue that comprising should be construed as "containing the matter listed thereafter (i.e., the enumerated plasticizer, copolymer, and gel)." This language is problematic because, under the terms of Claim 1, the plasticizer and copolymer are mixed to form a gel. Plaintiffs' definition would require the gel, which is the resulting elastomeric material after the plasticizer and copolymer are combined, be included as an element of the final product. Thus, the resulting gel would have to be added to itself to create the elastomeric material. Such a limitation is not present in the patent and would render the patent language nonsensical. Therefore, Plaintiffs' definition must be rejected.

Defendant's definition is consistent with the use of "comprising" as a term of art. Therefore, Defendant's definition will be adopted.

Turning to the term "copolymer," the parties disagree as to whether it is the copolymer that is contained in the elastomeric material or whether it is the copolymer ingredient before and after it is mixed with the plasticizer. The language of the specification and claim support the latter.

The language from Claim 1 provides for an "elastomeric material comprising" "a plasticizer" and "a SEEPS triblock copolymer" "wherein the plasticizer and copolymer are mixed to form a gel"—the resulting elastomeric material. This language suggests that the copolymer is not just a component of the final product, as Plaintiffs argue, but is also an

---

[35] *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997).

ingredient. The mixing of the copolymer with the plasticizer is what creates the elastomeric material.

Other language in the patent specification supports this conclusion. For example, the Detailed Description states that "gels may be fabricated using an A-B-A triblock copolymer plasticized with a plasticizing agent, such as an oil."[36] The Detailed Description goes on to discuss a specific SEEPS triblock copolymer, Septon 4044, which has a lower molecular weight and lower solution viscosity compared to other triblock copolymers. When Septon 4044 was combined with a plasticizer, it was discovered that the resulting gel, referred to as the 4044 gel, had certain properties providing advantages over other inventions in the field. Thus, the specification discusses both the properties of the copolymer prior to its combination with the plasticizer and the benefits of the gel after the copolymer is combined with the plasticizer.

The claims themselves discuss both the properties of the copolymer before it is combined with the plasticizer and the properties after. For example, Claim 1 requires that the copolymer have an "average molecular weight of about 125,000 to 175,000."[37] This is the same molecular weight range that Septon 4044 possesses. Similarly, the copolymer must have a certain solution viscosity, which Septon 4044 also contains.

Claim 1 goes on to state that when the copolymer is combined with the plasticizer, "the plasticizer tends to increase the percent elongation at break of said SEEPS triblock copolymer" and "tends to decrease the Gram Bloom rigidity of said SEEPS triblock copolymer."[38] Thus, the claim language requires the copolymer to have certain properties before it is mixed with the plasticizer and also discusses how the copolymer changes when mixed with the plasticizer.

---

[36] '765 Patent col. 1, l. 66–col. 2 l. 1.

[37] *Id.* col. 7, l. 63–64.

[38] *Id*. col. 8, l. 5–11.

13

Plaintiffs' proposed construction, limiting copolymer to the copolymer contained in the elastomeric material and not the copolymer ingredient, ignores the claim language and the information contained in the specification.

Plaintiffs rely on *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,[39] in support of their position that the '765 Patent discloses a product claim.

The patent at issue in *Exxon* was

> directed to [a] lubricating oil composition suitable as a crankcase lubricant in internal combustion engines comprising (1) a major amount of lubricating oil, (2) an ashless dispersant (*i.e.* one that neither contains nor is complexed with metal) in specified amounts of about 1 to 10 wt. %, (3) from about 0.01 to 5.0 parts by weight of oil soluble ZDDP, (4) 5 to 500 parts per million by weight of added copper in the form of an oil soluable copper compound, and (5) magnesium or calcium detergent.[40]

Exxon argued that its patent claimed "a 'recipe' of ingredients that extends to any product made by using the claimed ingredients, even if the product itself—as a result of chemical complexing—fails to include one of the claimed ingredients."[41] The trial court agreed with this interpretation and instructed the jury accordingly. The Federal Circuit disagreed.

The Federal Circuit found that "Exxon's claims are drawn to a specific product which has particularly defined ingredients. Nothing in the claims, the specification, or the prosecution history suggests that Exxon's claims are not drawn to a product that contains particular ingredients."[42]

---

[39] 64 F.3d 1553 (Fed. Cir. 1995).

[40] *Id*. at 1556 (internal quotation marks omitted).

[41] *Id*. at 1555.

[42] *Id*. at 1557.

The court noted that the title of the patent was "Lubricating Oil Compositions *Containing* Ashless Dispersant, [ZDDP], Metal Detergent and a Copper Compound."[43] The court further noted that the text of the patent specification included "over twenty references to 'containing' in reference to the ingredients claimed in the composition."[44] Finally, the court stated that during the prosecution history "Exxon repeatedly emphasized that the genius of its invention lay in the previously unknown synergism of this material [copper] with ZDDP in the presence of an ashless dispersant of the type described in the application . . . ."[45]

> In sum, a review of the claims, the specification, and the prosecution history all point to the conclusion that Exxon claims a product, not merely a recipe for making whatever product results from the use of the recipe ingredients. This conclusion respects that which is claimed, namely a chemical composition. The chemical composition exists at the moment the ingredients are mixed together. Before creation of the mixture, the ingredients exist independently. The particular proportions specified in the claims simply define the characteristics of the claimed composition.[46]

Based upon this, the court held that "Exxon's claims are to a composition that contains the specified ingredients at any time from the moment at which the ingredients are mixed together."[47] Under this interpretation, the jury should "have been asked to find whether Exxon had proved by a preponderance of the evidence that Lubrizol's products at some time contained each of the claimed recipe ingredients in the amounts specifically claimed."[48]

Plaintiffs argue that under *Exxon*, "the term 'comprising' refers to actually containing the matter listed thereafter (the enumerated plasticizer, copolymer and resulting gel), and the term

---

[43] *Id.*

[44] *Id*. (internal quotation marks omitted).

[45] *Id.*

[46] *Id.* at 1557–58.

[47] *Id.* at 1558.

[48] *Id.*

'copolymer' refers to the copolymer contained in the elastomeric material (not the copolymer ingredient used to make the elastomeric material)."[49] This is so, Plaintiffs argue, "because the claim, correctly construed as a product claim, encompasses the resultant material composition, not the ingredients to that material."[50]

*Exxon* is distinguishable from this case. While in *Exxon*, the claims, the specification, and prosecution history all pointed to the conclusion that Exxon was claiming a product, the evidence discussed above describes not only a final product, but also the steps and material required to create that product. As it relates specifically to the copolymer, the claim and specification describe the properties of that copolymer ingredient before it is mixed with the plasticizer and how it changes after it is combined. Therefore, the Court must reject Plaintiffs' arguments.

Based on the above, the Court construes copolymer as the limiting copolymer ingredient enumerated in the claim before and after it is mixed with the limiting plasticizer.

IV. CONCLUSION

The Court construes the terms at issue as follows:

Longitudinal Axis - the straight line running along the length of the column vertically from the column top to the column bottom or from one end of the column to the other end of the column

Length - the vertical dimension or height of a column when it is in the position it is typically used to support a load

Buckling - the planned failure or collapse of a column wall resulting in redistribution or lessening of the load carried by the column when the pressure is applied to the top of the column wall

---

[49] Docket No. 33, at 10.

[50] *Id.* (emphasis omitted).

16

Elastomeric Material - matter that yields elastically to pressure

Comprising - including the limitations that follow without excluding other elements

Copolymer - the limiting copolymer ingredient enumerated in the claim before and after it is mixed with the limiting plasticizer

    Pursuant to the Scheduling Order dated December 13, 2012, the parties are directed to file an attorney planning meeting report and proposed scheduling order within fourteen (14) days of this Order.

    Dated this 20th day of December, 2013.

                                             BY THE COURT:

                                             Ted Stewart
                                             United States District Judge