IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WATERTON POLYMER PRODUCTS USA, LLC; WATERTON POLYMER PRODUCTS, LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>EDIZONE, LLC,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING MIMINUM ROYALTY PROVISIONS<br><br><br>Case No. 2:12-CV-17 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Plaintiffs' Motion in Limine to Preclude Evidence or Argument Regarding Minimum Royalty Provisions.  Through their Motion, Plaintiffs seek to exclude evidence concerning alleged minimum royalty provisions contained in other agreements executed by Defendant.  For the reasons discussed below, the Court will deny the Motion.

Upon a finding of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[1]  "Two alternative categories of infringement compensation are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining."[2]

---

[1] 35 U.S.C. § 284.

[2] *Lucent Techs., Inc. v. Gateway*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

"The [reasonable] royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant."[3] "The hypothetical negotiation seeks to determine the terms of the license agreement the parties would have reached had they negotiated at arms length when infringement began."[4]

The following factors are considered in determining a reasonable royalty:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
7. The duration of the patent and the term of the license.
8. The established profitability of the product made under the patent; its commercial success; and its current popularity.
9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.
11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

---

[3] *Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).

[4] *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1357 (Fed. Cir. 2012).

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.[5]

As stated, a patentee may attempt to prove a reasonable royalty by presenting evidence of royalties received by the patentee for the licensing of the patent-in-suit and/or the rates paid by a licensee for the use of other patents comparable to the patent-in-suit. "Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace."[6] Such "evidence should carry considerable weight in calculating a reasonable royalty rate."[7]

"[T]he [comparable] licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit."[8] A patentee may not rely on license agreements that "are radically different from the hypothetical agreement under

---

[5] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[6] *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).

[7] *Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995).

[8] *Lucent Techs., Inc.*, 580 F.3d at 1325.

consideration."[9] "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."[10] Though there is always "an element of approximation and uncertainty" in making this determination,[11] the Federal Circuit has "cautioned that district courts performing reasonable royalty calculations [must] exercise vigilance when considering past licenses to technologies other than the patent in suit and must account for differences in the technologies and economic circumstances of the contracting parties."[12]

With this framework in mind, the Court considers the licenses Defendant seeks to admit. Defendant has provided the following explanation of its damages calculation:

> Waterton has unlawfully infringed the Intelli-Gel patents through at least offering to sell infringing products within the United States during each calendar quarter from the 4th quarter 2009 to the present 4th quarter 2014, totaling 21 calendar quarters. This infringing conduct has been in the fields of cushion components for use in bedding and seating products. For these fields of use within the United States, license issue fees and minimum royalties per calendar quarter had been negotiated in arms-length negotiations with third parties (see agreements with Advanced Comfort Technologies, Inc. (IntelliBED), Cloud Nine, Gaymar Industries and Natura World). That amount will be claimed as a basis for reasonable royalties. From this amount, EdiZONE anticipates subtracting the amounts actually received from existing licensees selling products in these fields of use within the United States. Also, EdiZONE anticipates adding to this amount an increase reasonably necessary to cover the risk associated with granting such a license at that time in conflict with the existing exclusive licenses.[13]

---

[9] *Id.* at 1327.

[10] *LaserDynamics, Inc.*, 694 F.3d at 79.

[11] *Unisplay, S.A.*, 69 F.3d at 517.

[12] *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (citations and internal quotation marks omitted).

[13] Docket No. 104, at 6–7.

Based upon this, it appears that Defendant seeks to introduce several license agreements it has entered into concerning the patents-in-suit in the field of cushion components. Each of those agreements requires the licensee to pay Defendant a minimum royalty amount, in addition to a percentage-based royalty based on sales. Plaintiffs argue that such evidence should be excluded.

Plaintiffs argue that the minimum royalty provisions are not relevant because the license agreements specifically anticipated active sales and marketing on the part of the licensees. "Under those circumstances, minimum royalty payments were acceptable, because it was anticipated by both parties that sales would exceed the minimum royalties and because the licensee was expressly incentivized to do so."[14] Plaintiffs go on to argue that it endeavored not to engage in sales in the United States and only made one sale. "Under these circumstances, the imposition of a minimum royalty would be tantamount to imposing a punitive sanction; essentially, requiring Waterton simultaneously to refrain from selling products while at the same time penalizing it for failing to maximize such sales during the time that this litigation has been pending."[15]

As set forth above, evidence of license agreements involving the patents-in-suit are highly probative and carry considerable weight. "Actual licenses to the patents-in-suit are probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure."[16] In this instance, Defendant has provided evidence that its license

---

[14] Docket No. 110, at 4.

[15] *Id.*

[16] *LaserDynamics, Inc.*, 694 F.3d at 79–80.

agreements contain minimum royalty provisions. Thus, it is appropriate to permit Defendant to argue that these provisions should be considered in determining a reasonable royalty in this case.

Plaintiffs' argument is similar to an argument made in *Transocean Offshore Deepwater Drillings, Inc. v. Maersk Drillings USA, Inc*. In *Transocean*, Maersk "offered drilling services which would use an infringing drill, but expressly reserved the right to modify the drill to avoid infringement. It did then modify the drill prior to delivery to avoid infringement—hence never actually using an infringing dual-activity drill."[17] Despite this, the jury awarded that patentee $15 million in compensatory damages.

Maersk argued that the damage award was not supported by the evidence. The Federal Circuit disagreed. The court noted that the patentee's model license agreement included an upfront fee of $15 million and a five percent running royalty. The patentee further provided evidence that it had entered into several license agreements with these terms.

The Federal Circuit found that this was substantial evidence supporting the jury's damage award. "A reasonable royalty may be based on an existing royalty, and a jury could conclude from Transocean's past licenses for its dual-activity technology that a hypothetical negotiation between the parties would result in a $15 million upfront payment. . . . . Indeed, several similarly situated competitors agreed to pay a $15 million upfront fee."[18]

The court also rejected Maersk's argument that the damages award was not supported because it only needed a license allowing it to sell or offer to sell a dual-activity rig.

> Although Maersk did not, in the end, deliver an infringing rig . . . the hypothetical negotiation used to calculate a reasonable royalty seeks to determine the terms of

---

[17] *Transocean*, 699 F.3d at 1358.

[18] *Id.*

6

the agreement the parties would have reached at the time the infringement began. In this case, a reasonable jury could conclude that at the time Maersk first infringed by offering a dual-activity rig for sale, the parties would have negotiated a license granting Maersk the right not only to offer the rig for sale, but also to deliver a rig that uses Transoceans' dual-activity technology.  Indeed, Transocean's proposed royalty of a $10–15 million upfront payment and a five percent running royalty assumes that the license grants Maersk "unfettered" future use of the licensed patents.[19]

Here, as in *Transocean*, Plaintiffs rely on the actions (or lack thereof) taken after the infringement began. However, as stated, "the hypothetical negotiation used to calculate a reasonable royalty seeks to determine the terms of the agreement the parties would have reached at the time the infringement began."[20]  The license agreements entered into by Defendant in this field of use are highly probative as to that determination, despite the fact that Plaintiffs only engaged in one sale.  A reasonable juror could infer that, at the time of the hypothetical negotiation, Plaintiffs would be just as motivated as the other licensees to maximize their sales. Moreover, Plaintiff's argument ignores the fact that the license agreements contain not only minimum royalty provisions, but also royalty provisions tied to actual sales.  So, while the licensees undoubtedly anticipated sales, they also agreed to minimum royalty payments even if no sales were made.

Further, as Defendant points out and is emphasized in *Transocean*, the hypothetical license the parties would have negotiated would not have been limited to sales, but would have also allowed Plaintiff to engage in all other activities that would otherwise infringe Defendant's patents.[21]

---

[19] *Id.* at 1358–59.

[20] *Id.*

[21] *See* 35 U.S.C. § 271(a).

The facts of this case are distinguishable from *Uniloc USA, Inc. v. Microsoft Corp.*,[22] relied upon by Plaintiffs. In *Uniloc*, the Federal Circuit addressed the admissibility of the twenty-five perecent rule of thumb—"a tool that has been used to approximate the reasonable royalty rate that the manufacturer of a patented product would be willing to offer to pay to the patentee during a hypothetical negotiation."[23]

The Federal Circuit rejected use of the rule, holding "as a matter of Federal Circuit law that the 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation. Evidence relying on the 25 percent rule of thumb is thus inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue."[24] The court reiterated its prior holdings, stating that "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."[25] The court held that "[t]he 25 percent rule of thumb as an abstract and largely theoretical construct fails to satisfy this fundamental requirement. The rule does not say anything about a particular hypothetical negotiation or reasonable royalty involving any particular technology, industry, or party."[26]

The court went on to state,

> This court's rejection of the 25 percent rule of thumb is not intended to limit the application of any of the *Georgia-Pacific* factors. In particular, factors 1 and 2— looking at royalties paid or received in licenses for the patent in suit or in

---

[22] 632 F.3d 1292 (Fed. Cir. 2011). Plaintiffs incorrectly state that this case was decided by the United States Supreme Court instead of the Federal Circuit.

[23] *Id.* at 1312.

[24] *Id.* at 1315.

[25] *Id.* at 1317.

[26] *Id.*

comparable licenses—and factor 12—looking at the portion of profit that may be customarily allowed in the particular business for the use of the invention or similar inventions—remain valid and important factors in the determination of a reasonable royalty rate.  However, evidence purporting to apply to these, and any other factors, must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time.[27]

In this case, as discussed, Defendant seeks to rely on license agreements concerning the patents-in-suit, which have been entered into by licensees engaged in the relevant field of use.  Those agreements contain minimum royalty provisions and can be considered by the jury in determining a reasonable royalty.  Such evidence satisfies the Federal Circuit's requirement that the evidence "be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time."[28]

Plaintiffs also object to the introduction of "an unrelated license agreement (involving entirely different patents) previously assigned to Waterton," the Chen license.[29]  As set forth above, before such an agreement could be admitted into evidence Defendant must show that this agreement is sufficiently comparable to the hypothetical license at issue in this case.  If Defendant can make this showing, the Chen license would admissible.  If not, it will be excluded.  However, the Court does not have sufficient information to make this determination at this time.  Therefore, the Court will reserve ruling on the admissibility of the Chen license until trial.

---

[27] *Id.* at 1317–18.

[28] *Id.* at 1318.

[29] Docket No. 110, at 3, 4.

Finally, Plaintiffs argue that permitting evidence related to a minimum royalty would be prejudicial because Defendant "has not disclosed the extent to which any minimum royalty payments were triggered with respect to all of those licenses over the years. Thus, the *net* royalty may have varied dramatically from license to license, and from year to year, depending on the actual volume of sales made by licensees."[30] If Plaintiffs believe that Defendant has failed to disclose information to which they are entitled, Plaintiffs may file an appropriate motion with the Court. However, the Court does not view this as a sufficient basis to exclude evidence of the minimum royalty provisions entirely.

It is therefore

ORDERED that Plaintiffs' Motion in Limine to Preclude Evidence or Argument Regarding Minimum Royalty Provisions (Docket No. 110) is DENIED as set forth above.

DATED this 6th day of November, 2014.

BY THE COURT:

Ted Stewart
United States District Judge

---

[30] *Id.* at 5.